No. 13-1696

IN THE

# United States Court of Appeals
# for the Fourth Circuit

––––––––––––––––

PRIORITY AUTO GROUP, INC.,

*Plaintiff-Appellant,*

v.

FORD MOTOR COMPANY,

*Defendant-Appellee.*

––––––––––––––––

On Appeal from the United States District Court
for the Eastern District of Virginia, 2:12-cv-00492-RBS-LRL
Chief District Judge Rebecca Beach Smith
Magistrate Judge Lawrence R. Leonard

––––––––––––––––

**BRIEF FOR DEFENDANT-APPELLEE
FORD MOTOR COMPANY**

––––––––––––––––

KURT D. WILLIAMS
BERKOWITZ OLIVER WILLIAMS SHAW
  & EISENBRANDT LLP
2600 Grand Boulevard, Suite 1200
Kansas City, MO 64108
(816) 561-7007

CHRISTOPHER T. HANDMAN
SEAN MAROTTA
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5719
chris.handman@hoganlovells.com

August 23, 2013

Counsel for Defendant-Appellee
Ford Motor Company

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Fourth Circuit Local Rule 26.1, Defendant-Appellee Ford Motor Company (Ford) states that it does not have a parent corporation and that there are publicly traded corporations that may, from time to time, own more than 10% of Ford's stock as trustee or independent fiduciary for various employee plans. The most recent trustee owner in this capacity is State Street Corporation.

Ford further states that no other publicly held corporation or other publicly held entity has a direct financial interest in the outcome of the litigation; that it is not a trade association; and that this case does not arise out of a bankruptcy proceeding.

# TABLE OF CONTENTS

<u>Page</u>

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ......................................i

TABLE OF AUTHORITIES ...............................................................iv

INTRODUCTION ...........................................................................1

STATEMENT OF THE ISSUES.............................................................4

STATEMENT OF FACTS ..................................................................4

STANDARD OF REVIEW .................................................................12

SUMMARY OF ARGUMENT .............................................................13

ARGUMENT ................................................................................16

I.  THE DISTRICT COURT CORRECTLY HELD THAT A
    WOULD-BE PURCHASER HAS NO STANDING TO
    CHALLENGE THE ADEQUACY OF CONSIDERATION
    OFFERED BY A MANUFACTURER—AND ACCEPTED BY
    THE DEALER—PURSUANT TO A RIGHT OF FIRST
    REFUSAL..............................................................................16

    A.  The Plain Language Of The Statute And Its Structure
        Confirm That A Disappointed Purchaser Does Not Have
        Standing To Assert The Seller's Statutory Right To
        Equivalent Consideration ...................................................16

    B.  Cases Interpreting Similar State Motor Vehicle Franchise
        Statutes Confirm That Priority Does Not Have Standing..................25

II. THE DISTRICT COURT CORRECTLY REJECTED
    PRIORITY'S TORT CLAIMS FOR INTERFERENCE WITH
    CONTRACT AND BUSINESS EXPECTANCY BECAUSE
    FORD DID NOT USE IMPROPER METHODS NOR IS IT A
    THIRD-PARTY TO THE AGREEMENT ...........................................31

# TABLE OF CONTENTS—Continued

Page

A.   Ford Did Not Employ An Improper Method Of Interfering With Priority's Business Relationship With Kimnach By Exercising Its Contractual And Statutory Right Of First Refusal ...................................................................................33

B.   Ford Could Not Tortiously Interfere With Priority's Business Relationship With Kimnach Because It Was Not A Stranger To The Relationship ..........................................................38

CONCLUSION .........................................................................................42

STATEMNT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

STATUTORY ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

**CASES:**

*A & E Supply Co.* v. *Nationwide Mut. Fire Ins. Co.*,
    798 F.2d 669 (4th Cir. 1986) ............................................................... 18

*Am. Chiropractic Ass'n* v. *Trigon Healthcare, Inc.*,
    367 F.3d 212 (4th Cir. 2004) .............................................................. 13

*Am. Motors Sales Corp.* v. *Div. of Motor Vehs. of Va.*,
    592 F.2d 219 (4th Cir. 1979) ........................................................... 7, 8

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009) ............................................................................ 12

*Beard Motors, Inc.* v. *Toyota Motor Distribs., Inc.*,
    480 N.E.2d 303 (Mass. 1985) ................................................ 25, 29, 30

*Big Apple BMW, Inc.* v. *BMW of N. Am., Inc.*,
    974 F.2d 1358 (3d Cir. 1992) ....................................................... 27, 36

*Blair* v. *Gen. Motors Corp.*,
    838 F. Supp. 1196 (W.D. Ky. 1993) .......................................... 25, 30, 31

*Bray* v. *Brown*,
    521 S.E.2d 526 (Va. 1999) .................................................................. 21

*CGM, LLC* v. *BellSouth Telecomms., Inc.*,
    664 F.3d 46 (4th Cir. 2011) ................................................................ 18

*Chaves* v. *Johnson*,
    335 S.E.2d 97 (Va. 1985) ...................................................... 32, 33, 34

*Commerce Funding Corp.* v. *Worldwide Security Servs. Corp.*,
    249 F.3d 204 (4th Cir. 2001) .............................................................. 36

*Commercial Bus. Sys., Inc.* v. *Halifax Corp.*,
    484 S.E.2d 892 (Va. 1997) .................................................................. 32

*Crivelli* v. *Gen. Motors Corp.*,
    215 F.3d 386 (3d Cir. 2000) .......................................................... 36, 37

# TABLE OF AUTHORITIES—Continued

Page

*Cummings* v. *Fulghum*,
540 S.E.2d 494 (Va. 2001) ...........................................................20, 21

*Cupp* v. *Bd. of Supervisors of Fairfax County*,
318 S.E.2d 407 (Va. 1984) .................................................................18

*Duggin* v. *Adams*,
360 S.E.2d 832 (Va. 1987) ...................................................31, 32, 33

*Dunn, McCormack & MacPherson* v. *Connolly*,
708 S.E.2d 867 (Va. 2011) .......................................................34, 35

*Edwards* v. *City of Goldsboro*,
178 F.3d 231 (4th Cir. 1999) ............................................................12

*Ernie Haire Ford, Inc.* v. *Ford Motor Co.*,
260 F.3d 1285 (11th Cir. 2001) ........................................................40

*Fox* v. *Deese*,
362 S.E.2d 699 (Va. 1987) ................................................................38

*Fresno Motors, LLC* v. *Mercedes-Benz USA, LLC*,
852 F. Supp. 2d 1280 (E.D. Ca. 2012) ...........................25, 30, 41, 42

*Genet Co.* v. *Anheuser-Busch, Inc.*,
498 So. 2d 683 (Fla. Dist. Ct. App. 1986)........................................39

*Gonzales-Servin* v. *Ford Motor Co.*,
662 F.3d 931 (7th Cir. 2011) ............................................................37

*Hand* v. *Chrysler Corp.*,
30 F. Supp. 2d 667 (D. Vt. 1998) .......................................25, 30, 31

*Key* v. *Chrysler Motors Corp.*,
918 P.2d 350 (N.M. 1996).................................................................30

*Lewis-Gale Med. Ctr., LLC* v. *Alldredge*,
710 S.E.2d 716 (Va. 2011) ..........................................15, 33, 34, 36

## TABLE OF AUTHORITIES—Continued

Page

*Marin Tug & Barge, Inc.* v. *Westport Petroleum, Inc.*,
   271 F.3d 825 (9th Cir. 2001) ........................................................38, 39

*Maximus, Inc.* v. *Lockheed Info. Mgmt. Sys. Co.*,
   493 S.E.2d 375 (Va. 1997) .................................................34

*McKinney* v. *Anheuser-Busch, Inc.*,
   1991 WL 268700 (9th Cir. Dec. 16, 1991).........................................38

*Morse* v. *Ted Cadillac, Inc.*,
   537 N.Y.S.2d 239 (N.Y. App. Div. 1989)....................................40, 41

*Noeller* v. *GMC Truck & Coach Div.*,
   772 P.2d 271 (Kan. 1989)...........................................40, 41

*Northside Mercury Sales & Serv., Inc.* v. *Ford Motor Co.*,
   871 F.2d 758 (8th Cir. 1989) ................................................39

*Pasqualetti* v. *Kia Motors Am., Inc.*,
   663 F. Supp. 2d 586 (N.D. Ohio 2009) ............................................41

*Preferred Sys. Solutions, Inc.* v. *GP Consulting, LLC*,
   732 S.E.2d 676 (Va. 2012) ........................................................35, 36

*R.A., Inc.* v. *Anheuser-Busch, Inc.*,
   556 N.W.2d 567 (Minn. Ct. App. 1996)............................................39

*Recalde* v. *ITT Hartford*,
   492 S.E.2d 435 (Va. 1997) ........................................................31

*Roberts* v. *Gen. Motors Corp.*,
   643 A.2d 956 (N.H. 1994)..............................................25, 28, 29

*Rosado* v. *Ford Motor Co.*,
   337 F.3d 291 (3d Cir. 2003) ................................................*passim*

*School Bd. of Norfolk* v. *Giannoutsos*,
   380 S.E.2d 657 (Va. 1989) ........................................................23

## TABLE OF AUTHORITIES—Continued

Page

*Tacoma Auto Mall, Inc.* v. *Nissan N. Am., Inc.*,
279 P.3d 487 (Wash. Ct. App. 2012)................................................25

*Travelers Prop. Cas. Co. of Am.* v. *Ely*,
666 S.E.2d 523 (Va. 2008) ...............................................................21

*Tynan* v. *Gen. Motors Corp.*,
591 A.2d 1024 (N.J. App. Div. 1991), *rev'd in part on other grounds*,
604 A.2d 99 (N.J. 1992) ...............................................................30, 36

*U.S. ex rel. Nathan* v. *Takeda Pharm. N. Am., Inc.*,
707 F.3d 451 (4th Cir. 2013) ............................................................12

*Wag More Dogs, Ltd.* v. *Cozart*,
680 F.3d 359 (4th Cir. 2012) .......................................................12, 13

*Williams* v. *Dominion Tech. Partners, LLC*,
576 S.E.2d 752 (Va. 2003) ...............................................................33

*Wyatt* v. *McDermott*,
725 S.E.2d 555 (Va. 2012) ...............................................................31

**STATUTES:**

63 Pa. Stat. Ann. § 818.16 ................................................................26

63 Pa. Stat. Ann. § 818.29 ................................................................26

Mass. Gen. Laws ch. 93B, §12A .......................................................29

N.H. Rev. Stat. Ann. § 357-C:12 ......................................................28

Va. Code Ann. § 46.2-1569(3)....................................................*passim*

Va. Code Ann. § 46.2-1569(3a)..................................................*passim*

Va. Code Ann. § 46.2-1569.1 .....................................................*passim*

Va. Code Ann. § 46.2-1569.1(1).........................................................7

Va. Code Ann. § 46.2-1569.1(2)..................................................*passim*

## TABLE OF AUTHORITIES—Continued

Page

Va. Code Ann. § 46.2-1569.1(3).................................................................7

Va. Code Ann. § 46.2-1569.1(4)...................................................2, 7, 22, 23

Va. Code Ann. § 46.2-1568(A)(4) ...........................................................6

Va. Code Ann. § 46-2.1572 ....................................................................5

**RULE:**

Ninth Circuit R. 36-3(c) .......................................................................38

**OTHER AUTHORITIES:**

Black's Law Dictionary (6th ed. 1990) ....................................................21

*Restatement (Second) of Torts* § 766 (1977) ...........................................32

IN THE

# United States Court of Appeals
# for the Fourth Circuit

———————————

No. 13-1696

———————————

PRIORITY AUTO GROUP, INC.,

Plaintiff-Appellant,

v.

FORD MOTOR COMPANY,

Defendant-Appellee.

———————————

On Appeal from the United States District Court
for the Eastern District of Virginia, 2:12-cv-00492-RBS-LRL
Chief District Judge Rebecca Beach Smith
Magistrate Judge Lawrence R. Leonard

———————————

**BRIEF FOR DEFENDANT-APPELLEE
FORD MOTOR COMPANY**

———————————

## INTRODUCTION

Ford Motor Company, like many automobile manufacturers, can exercise a contractual right of first refusal when one of its dealers tries to sell its franchise. Virginia, like many states, imposes certain restrictions on how that right of first refusal can be exercised. This case concerns one of them: an obligation that the manufacturer's offer give the selling dealer consideration that is on par with that offered by the initial purchaser.

1

What makes this case unique—extraordinary, really—is that it is not the dealer who has sued Ford for having allegedly failed to provide the dealer with adequate consideration.  The plaintiff instead is the unhappy initial bidder.  But as the District Court below held, there is no reason "why the Virginia General Assembly would grant the prospective *buyer* the right to sue a manufacturer for allegedly depriving the *dealer* of the consideration to which it is entitled."  J.A. 952 (emphasis added).

That is why the Virginia General Assembly did no such thing.  What it did instead was create distinct rights for the selling dealer and the would-be purchaser.  The selling dealer is entitled to receive—and to sue for—adequate consideration, *see* Va. Code Ann. § 46.2-1569.1(2), while the frustrated purchaser is entitled to receive—and to sue for—the reasonable costs and attorney's fees it incurred up until the manufacturer exercised its right of first refusal, *see id.* § 46.2-1569.1(4).

The frustrated purchaser in this case, Priority Auto Group, Inc. (Priority), does not dispute that Ford ultimately paid Priority all its reasonable expenses under Section 1569.1(4).  *See* J.A. 19-20; 964.  And Priority concedes that it has no direct standing under Section 1569.1(2), the provision that authorizes the dealer to demand from the manufacturer adequate consideration.  Priority Br. 15.  Priority nevertheless insists that it can backdoor that same challenge through a different provision of the Act, which grants would-be purchasers standing to challenge

unreasonable conditions that a manufacturer imposes on a sale. *See* Va. Code Ann. § 46.2-1569(3a) (hereinafter Subdivision 3a). But Priority's novel bid falters at the plain language of the very provision it invokes. In unmistakably clear language, the final sentence of Subdivision 3a provides: "Notwithstanding the foregoing, the right of first refusal by a manufacturer * * * pursuant to § 46.2-1569.1 shall not be considered the imposition of a condition prohibited by this section." *Id.* § 46.2-1569(3a). The District Court correctly applied the statute as written to reject Priority's dubious claim.

And make no mistake about its dubiousness. Courts around the country have squarely rejected the same challenge brought by would-be purchasers under the franchise laws of other states. As the Third Circuit has held—in a case discussed at length in the District Court's opinion below but curiously absent from Priority's opening brief—"[a] prospective purchaser lacks standing to claim that the selling dealer did not receive the same or greater consideration." *Rosado* v. *Ford Motor Co.*, 337 F.3d 291, 296 (3d Cir. 2003). This Court should follow the lead of the Third Circuit and the many other state and federal courts that have reached similar results, and affirm the judgment below.

The same goes for Priority's claim for tortious interference. The District Court sensibly held—in line again with decisions across the country—that a manufacturer does not tortiously interfere with a business relationship when it

3

exercises a customary right of first refusal. Were the rule otherwise, *every* invocation of the right of first refusal could constitute tortious interference. Neither precedent nor common sense supports that result. The District Court's judgment rejecting Priority's claims across the board should be affirmed.

## STATEMENT OF THE ISSUES

1. Whether the District Court correctly held that, when an automobile manufacturer exercises its right of first refusal, the initial purchaser lacks standing under Virginia law to contest the adequacy of the consideration that the manufacturer offered and the selling dealer accepted.

2. Whether the District Court correctly held that a would-be purchaser cannot pursue claims for tortious interference with contract and business expectancy against an automobile manufacturer for simply exercising its contractual and statutory right of first refusal.

## STATEMENT OF FACTS

**Background.** Ford sells its products in the United States through a nationwide network of independent franchised dealers. The relationship between Ford and its dealers is governed by a standard franchise contract, known as the Ford Sales and Service Agreement (Agreement). J.A. 100-180. One important way the Agreement regulates the manufacturer-dealer relationship is by regulating how the dealer may go about selling its franchise to another party. On the one

hand, the Agreement recognizes that a dealer should be free to fetch the best price it can on the open market. J.A. 178. Yet on the other hand, the Agreement acknowledges that selling a dealership is no ordinary business transaction. Because Ford's fortune in the marketplace turns, to a large degree, on how good its dealers are, Ford must maintain some control over who can—and cannot—sell Ford vehicles. *Id.* So the Agreement gives Ford a right of first refusal to purchase the dealer's assets "on the same terms and conditions offered or agreed to" by a prospective purchaser. *Id.*[1]

Although the franchise relationship between Ford and its dealers is established by contract, virtually all states have enacted motor vehicle franchise statutes that supplant or supplement those contractual rights to varying degrees. This case concerns three provisions of Virginia's Motor Vehicle Franchise Law.

Section 46.2-1569(3) of the Virginia Code—which we refer to as Subdivision 3 in this brief—cabins the manufacturer's ability to veto a sale entirely. It does so by forbidding a manufacturer from "prevent[ing] or refus[ing] to approve the sale or transfer of the ownership of a dealership" except for "reasonable" cause. Va. Code Ann. § 46-2.1569(3). Subdivision 3 then goes on to provide that "the only grounds that may be considered reasonable" are that the

---

[1] Under the Agreement, Ford's right of first refusal can be assigned to another entity, as it was in this case. J.A. 178. That is important because Virginia, like many states, prohibits manufacturers from operating dealerships directly. Va. Code Ann. § 46-2.1572.

proposed purchaser "(i) lacks good moral character, (ii) lacks reasonable motor vehicle dealership management experience and qualifications, (iii) lacks financial ability to be the dealer, or (iv) fails to meet the standards otherwise established" by the Virginia Code to be a dealer.  *Id.*

While Subdivision 3 limits a manufacturer's ability to thwart a sale outright, its adjoining provision—Subdivision 3a—applies when a manufacturer allows the dealer to sell the franchise but imposes conditions on the sale.  In those circumstances, Subdivision 3a makes it unlawful to "impose a condition on the approval of the sale * * * if the condition would violate the provisions of the [Virginia Motor Vehicle Franchise Law] if imposed on the existing dealer."  Va. Code Ann. § 46.2-1569(3a).  For instance, the Virginia Motor Vehicle Franchise Law prohibits a manufacturer from requiring a franchisee to assign its retail-sale installment contracts to a particular financing company.  *See* Va. Code Ann. § 46.2-1568(A)(4).  Subdivision 3a sensibly provides that a manufacturer could not require, as a condition of sale on a franchise, that the new dealer-purchaser agree to assign its retail-sale installment contracts to the manufacturer's company of choice.  *See id.* § 46.2-1569(3a).

But there is one type of condition that Subdivision 3a categorically exempts from its reach:  a manufacturer's customary right of first refusal.  The final sentence of Subdivision 3a provides that "[n]otwithstanding the foregoing, an

6

exercise of the right of first refusal by the manufacturer * * * pursuant to § 46.2-1569.1 shall not be considered the imposition of a condition prohibited by this section." *Id.*

And that gets to the third key provision at issue in this case. Section 1569.1 sets forth four things a manufacturer must do when it exercises its right of first refusal, though only two are relevant to this case. *See id.* § 46.2-1569.1.[2] The first is directed solely to the interests of the existing franchisee. It mandates that the offer put forth by the manufacturer (or its assignee) "result in the dealer's and dealer's owner's receiving the same or greater consideration as they have contracted to receive" from the original purchaser. *Id.* § 46.2-1569.1(2). The second is directed to the original would-be purchaser whose offer has been trumped by the right of first refusal. It provides that the manufacturer must "agree[] to pay the reasonable expenses, including attorney's fees which do not exceed the usual, customary, and reasonable fees charged for similar work done for other clients, incurred by the proposed new owner and transferee." *Id.* § 46.2-1569.1(4).

Because the principal aim of Virginia's automobile franchise statute is to remedy a perceived " 'disparity in bargaining power between automobile

---

[2] The two provisions not at issue here (i) require the manufacturer to notify the dealer in writing within 45 days that it intends to exercise its right of first refusal and (ii) prohibit the manufacturer from exercising its right of first refusal when the proposed sale is to a family member of the existing dealer or a qualified manager employed by the existing dealer. *See* Va. Code Ann. § 46.2-1569.1(1), (3).

manufacturers and their dealers,' " *Am. Motors Sales Corp.* v. *Div. of Motor Vehs. of Va.*, 592 F.2d 219, 222 (4th Cir. 1979) (citation omitted), only dealers—for the most part—have standing to contest violations of the Act.  But the General Assembly created three narrow exceptions for prospective franchise purchasers. The second paragraph of Subdivision 3a addresses the first two.  It provides:  "If the existing dealer does not request a hearing by the Commissioner concerning the action [to disapprove the sale outright under Subdivision 3] or the condition imposed by the manufacturer [under the first paragraph of Subdivision 3a] * * *, and the action or condition was the proximate cause of the failure of the contract for the sale or transfer of ownership of the dealership, the applicant for approval of the sale or transfer or the existing dealer, or both, may commence an action at law for violation of this section."  Va. Code Ann. § 46.2-1569(3a).  This provision thus grants a disgruntled would-be purchaser standing to sue when a manufacturer refuses outright to approve a sale or allows the sale but imposes an unlawful condition on it.

But because a right of first refusal is categorically exempt from the prohibitions of Subdivision 3a, the would-be purchaser must look to Section 1569.1 itself to see what rights the General Assembly granted it.  And the only remedy the General Assembly provided the would-be purchaser with standing to

pursue in Section 1569.1 is a claim for reasonable expenses, including attorney's fees. *Id.* § 1569.1.

**Priority's Quest To Obtain A Ford Dealership.**  Priority is the owner and operator of eleven automobile dealerships in the Norfolk area, representing eight different manufacturers.  J.A. 10, 14.  But Ford is not among them.  Eager to join the Ford family, Priority entered into an asset purchase agreement with Kimnach Ford Inc. (Kimnach) to purchase Kimnach's Ford dealership.  J.A. 11.  Knowing that Ford had to assent to the sale, Kimnach submitted the purchase agreement to Ford and asked Ford to approve Priority as a Ford dealer.  J.A. 13.

After due consideration, Ford informed Kimnach that Ford would exercise its contractual and statutory right of first refusal.  J.A. 13.  Ford also notified Priority that Ford was rejecting Priority's request to purchase Kimnach's assets. Because it had elected to exercise its right of first refusal, Ford explained that Priority's application to become a Ford dealer was moot.  J.A. 13-14.

In rejecting Priority's application, Ford freely admitted that it considered Priority a worthy dealer.  J.A. 14.  The problem, Ford explained, had nothing to do with Priority and all to do with economics.  The Norfolk area was already super-saturated with Ford dealerships.  So Ford sensibly used this opportunity to buy out Kimnach and close that dealership, thus consolidating Ford's dealerships in the Norfolk region.  J.A. 14.  Ford achieved that business goal by assigning its right of

9

first refusal to an entity formed by the three other Ford dealers in the region, Dealership Acquisition Company, LLC (DAC). J.A. 14. DAC, acting as Ford's assignee, purchased Kimnach's assets and closed the Kimnach dealership. J.A. 14-15. Kimnach was apparently satisfied with the deal it received from Ford; it accepted Ford's multi-million-dollar offer and has never sued Ford for violating its contractual and statutory obligations to provide adequate consideration.

**This Suit.** Priority, however, was less satisfied. Priority sued, alleging that Ford had violated the Virginia Motor Vehicle Franchise Law and that Ford had tortiously interfered with Priority's contract and business expectancy by exercising its right of first refusal. J.A. 15-19. The thrust of Priority's statutory and tort claims were the same: because Ford allegedly had not provided *Kimnach* consideration for its assets equal to that offered by Priority, *Priority* was entitled to $15 million in profits that it claims it would have earned had it consummated the Kimnach purchase. J.A. 15-21. And Priority demanded this $15 million windfall even though Ford and Priority were eventually able to agree on the more modest (and exclusive) remedy that the franchise statute expressly grants would-be purchasers trumped by a right of first refusal: its reasonable costs, including attorney's fees, incurred before Ford exercised its right of first refusal under Section 1569.1. J.A. 20-21, 964.

10

Priority filed suit in Virginia state court, and Ford removed on the basis of diversity to the United States District Court for the Eastern District of Virginia, Dkt. No. 1, where it sought judgment on the pleadings. Dkt. No. 14. Ford explained that Priority—the would-be purchaser—had no standing to assert the statutory right of Kimnach—the seller—to receive appropriate consideration from Ford. That was particularly true, given that Kimnach, a sophisticated automobile dealer, had actually accepted the millions of dollars in consideration that Ford had offered. For similar reasons, Ford could not have tortiously interfered with Priority's contract and business expectancy. After all, Ford did nothing more than exercise rights it enjoyed under both contract and positive law. In the alternative, Ford pointed out that it could not have interfered with Priority's contract with Kimnach or Priority's business expectancy because Ford was not a third party to either; Ford's assent was a prerequisite to the Priority-Kimnach deal closing.

The District Court referred Ford's motion to a magistrate judge for a report and recommendation. J.A. 307-308. After hearing oral argument, J.A. 309-370, the magistrate judge issued a comprehensive 27-page report recommending that Ford's motion be granted. J.A. 935-963. The magistrate judge agreed with Ford that Priority did not have statutory standing under Subdivision 3a to invoke Kimnach's statutory right to receive more consideration from Ford than Ford had already offered and Kimnach had already accepted. J.A. 940-953. It would defy

11

both the plain language of Section 3a—which explicitly exempts a manufacturer's exercise of its statutory right of first refusal—and common sense to conclude that Virginia's General Assembly intended that a *buyer* should have standing to assert a *seller's* right to appropriate consideration.  J.A. 949-953.  The magistrate judge also agreed with Ford that Priority's tortious interference claims failed as a matter of law.  J.A. 953-960.  Because Ford was an integral party to the Kimnach-Priority business relationship and did no more than what it was entitled to do under the Sales and Service Agreement and Virginia law, Ford's interference with Priority's business relationship with Kimnach was not wrongful.  J.A. 959-960.

The District Court adopted the magistrate judge's "thorough, well-reasoned Report" and granted Ford's motion.  J.A. 969-971.  This appeal followed.  J.A. 973.

## STANDARD OF REVIEW

This Court reviews the District Court's grant of Ford's motion for judgment on the pleadings *de novo* under the standard applicable to a motion to dismiss for failure to state a claim.  *Edwards* v. *City of Goldsboro*, 178 F.3d 231, 243-244 (4th Cir. 1999).  To survive a motion to dismiss, Priority's complaint must " 'state a claim to relief that is plausible on its face.' "  *U.S. ex rel. Nathan* v. *Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (quoting *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009)).  In judging the plausibility of Priority's complaint, this Court " 'take[s] the facts in the light most favorable to [Priority],' " but "need not accept

legal conclusions couched as facts." *Wag More Dogs, Ltd.* v. *Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (citation omitted).

Priority agrees with all this. Priority Br. 13-14. But Priority then asserts—without citation—that "all matters in the record [are] appropriate for consideration in this appeal" because "Ford injected matters outside the pleadings into its motion for partial judgment." Priority Br. 14. Not so. A district court may consider a document attached to a defendant's motion for judgment on the pleadings without converting it to a motion for summary judgment " '[if] it was integral to and explicitly relied on in the complaint and [if] the plaintiff[] do[es] not challenge its authenticity.' " *Am. Chiropractic Ass'n* v. *Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (citation omitted).

Here, the only extrinsic document attached to Ford's motion that the District Court considered was the Sales and Service Agreement. J.A. 939-940. Priority never questioned the authenticity of the Agreement, which Priority itself cited in its Complaint. J.A. 939-940 (citing J.A. 12-13 ¶¶ 8, 18). This Court should therefore limit its review to Priority's Complaint and the Agreement and ignore the reams of summary-judgment exhibits Priority has needlessly included in the joint appendix.

## SUMMARY OF ARGUMENT

I. The District Court correctly held that a disappointed purchaser has no standing to contest the adequacy of the consideration offered by a manufacturer—

and accepted by the seller.  Priority does not dispute that it lacks standing to raise that claim directly under Section 1569.1(2), the provision that mandates equivalent consideration.  But it argues that it can mount the same challenge indirectly through Subdivisions 3 and 3a.

It cannot.  Subdivision 3 is plainly inapplicable because it applies only where the manufacturer has vetoed a sale outright, not imposed a condition on the sale, as occurred here.  And although Subdivision 3a does indeed regulate the conditions a manufacturer can impose on a sale, it expressly provides that "an exercise of the right of first refusal by the manufacturer * * * pursuant to § 46.2-1569.1 shall not be considered the imposition of a condition prohibited by this section."  Va. Code Ann. § 46.2-1569(3a).

The structure of the Act confirms what the text makes clear.  Under Section 1569.1(2), the real party in interest when a manufacturer offers inadequate consideration—the selling dealer—can recover only the difference between that offer and the initial bidder's offer.  But as Priority reads the statute, it is entitled to seek tens of millions of dollars in lost-profit damages.  Nothing in the Act's text, structure, or legislative history suggests that the General Assembly would have wanted to give disgruntled purchasers greater remedies than those bestowed on the parties most directly affected by an inadequate offer.

14

The District Court's decision not only honors the language of the statute, but it also joins a long line of cases from around the country that have rejected similar arguments brought under analogous franchise statutes. Priority's opening brief has not one word to say about these cases. This Court should affirm the District Court's judgment.

II. Priority's tort claims for interference with contract and business expectancy are likewise baseless. Under Virginia law, for a defendant's interference to be tortious, the defendant must have used "improper methods." *See Lewis-Gale Med. Ctr., LLC* v. *Alldredge*, 710 S.E.2d 716, 722 (Va. 2011). The only "method" Ford used to impact the Priority-Kimnach relationship was to exercise its own contractual right of first refusal. There is nothing improper about that, which is why courts routinely reject claims of this vintage.

In any event, Priority's tort claims fail because for them to be viable, Ford must be a third party to the Priority-Kimnach business relationship. But Ford was no disinterested stranger; after all, the Priority-Kimnach transaction was contingent on Ford approving Priority as a Ford franchisee. Like Priority's statutory claim, courts across the nation have held on identical facts that a franchisor as a matter of law cannot tortiously interfere with its franchisees' asset purchase agreements. And like its statutory claim, Priority offers no compelling reason for this Court to hold otherwise.

# ARGUMENT

## I. THE DISTRICT COURT CORRECTLY HELD THAT A WOULD-BE PURCHASER HAS NO STANDING TO CHALLENGE THE ADEQUACY OF CONSIDERATION OFFERED BY A MANUFACTURER—AND ACCEPTED BY THE DEALER— PURSUANT TO A RIGHT OF FIRST REFUSAL.

Priority's principal claim on appeal is audacious.  Priority insists that it—as a disgruntled would-be purchaser—has standing to contest the adequacy of consideration that Ford offered to the selling dealer, even though the dealer itself accepted Ford's offer and never invoked the statutory mechanism that existing dealers have for contesting the adequacy of a manufacturer's substitute consideration.  That bold claim conflicts with common sense, case law from around the country (which Priority positively ignores in its opening brief), and— most importantly—the text and structure of the Virginia Motor Vehicle Franchise Law.  The District Court recognized that.  This Court should affirm.

### A. The Plain Language Of The Statute And Its Structure Confirm That A Disappointed Purchaser Does Not Have Standing To Assert The Seller's Statutory Right To Equivalent Consideration.

Priority's opening brief is not always easy to follow.  But its argument boils down to this:  Priority, as a disappointed would-be purchaser, is entitled to challenge "whether Ford's exercise of the right of first refusal met the standard of § 46.2-1569.1."  Priority Br. 15; *see also id.* at 2 (Ford's "right of first refusal failed to meet the standards required under Virginia law set forth in Va. Code

16

§46.2-1569.1."). Section 1569.1 actually sets forth several standards, but Priority is only interested in enforcing one: the mandate that a manufacturer's offer "result in the dealer's and dealer's owner's receiving the same or greater consideration as they have contracted to receive" from the original purchaser. Va. Code Ann. § 46.2-1569.1(2); Priority Br. 16-17. As Priority would have it, even if a sophisticated seller accepts the deal the manufacturer offers—and even if that sophisticated seller elects to forgo its clear statutory right to contest the adequacy of the manufacturer's consideration—the disappointed initial bidder can paternalistically step in and sue the manufacturer for having shortchanged the seller.

But that's not all. Under Priority's theory, the would-be purchaser is entitled to seek *more* relief than even the seller could under the statute. When a selling dealer believes the manufacturer's consideration is inadequate, it can bring an action under Section 1569.1(2) to compel the manufacturer to make up the difference. Priority, however, makes no claim to that modest sum. Instead, Priority insists that if it can prove that Ford failed to provide Kimnach with adequate consideration, then Priority can reap more than *$15 million in lost-profits damages*. J.A. 15-21.

Priority's opening brief thus raises a basic question for this Court: Just where exactly in the statute did the General Assembly give would-be purchasers

17

like Priority this remarkable power?  After all, Virginia does not bestow private rights of action on all comers; instead a party must demonstrate that it has standing to pursue a particular statutory claim by showing that it "has a substantial legal right" under the statute.  *Cupp* v. *Bd. of Supervisors of Fairfax County*, 318 S.E.2d 407, 411 (Va. 1984).[3]  And as a federal tribunal sitting in diversity, this Court is rightly "reluctant to read private rights of action into state laws where state courts and state legislatures have not done so," lest it "abrogate[] both the prerogatives of the political branches and the obvious authority of states to sculpt the content of state law."  *A & E Supply Co.* v. *Nationwide Mut. Fire Ins. Co.*, 798 F.2d 669, 674 (4th Cir. 1986).

Priority notably does not suggest that it has standing to pursue its Section 1569.1(2) claim directly under Section 1569.1(2).  Priority Br. 15 ("The issue is not whether Priority has standing under §46.2-1569.1 to bring suit * * *.").  And for good reason:  That provision speaks exclusively about the interests of the selling dealer; it is the dealer, not the buyer, who is entitled to "receiv[e] the same or greater consideration as they have contracted to receive."  Va Code Ann. 46.2-1569.1(2).  An unhappy initial bidder quite clearly does not have standing to pursue a claim for inadequate consideration under Section 1569.1(2).

---

[3] Unlike Article III standing, standing in this context refers to " 'whether a statute creating a private right of action authorizes a particular plaintiff to avail herself of that right of action.' "  *CGM, LLC* v. *BellSouth Telecomms., Inc.*, 664 F.3d 46, 52 (4th Cir. 2011) (citation omitted).

So Priority casts about for a textual backdoor. It purports to find two—Subdivisions 3 and 3a—but both lead to dead ends. To be perfectly clear: Ford does not dispute that the General Assembly gave would-be purchasers like Priority standing to pursue violations of Subdivisions 3 and 3a; it clearly did.[4] What Ford disputes—as did the District Court—is that those Subdivisions can be used to vindicate a violation of the equivalent-consideration requirement under Section 1569.1(2).

Although Priority spills much ink talking about Subdivision 3, that provision is plainly inapplicable. According to Priority, Subdivision 3 protects it from being "improperly rejected as a dealer applicant." Priority Br. 15. But that is not what Subdivision 3 says. What it says is that it is unlawful for a manufacturer "to prevent or refuse to approve the sale * * * of a dealership." Va. Code Ann. § 46.2-1569(3). By its plain terms, Section 3 applies only when a manufacturer vetoes a sale outright. Here, however, Ford did not "prevent or refuse to approve the sale * * * of a dealership." *Id.* Instead, it simply imposed a condition on the sale; namely, that the dealership be sold to DAC, not Priority.

---

[4] *See* Va. Code Ann. § 46.2-1569(3a) ("If the existing dealer does not request a hearing by the Commissioner concerning the action [to disapprove the sale under Subdivision 3] or the condition imposed by the manufacturer [under the first paragraph of Subdivision 3a] * * *, and the action or condition was the proximate cause of the failure of the contract for the sale or transfer of ownership of the dealership, the applicant for approval of the sale or transfer or the existing dealer, or both, may commence an action at law for violation of this section.").

19

Priority's fallback—Subdivision 3a—is no better, though it at least regulates the conditions that a manufacturer can impose on a sale. *See* Va. Code Ann. § 46.2-1569(3a) (making it unlawful "[t]o impose a condition on the approval of the sale * * * if the condition would violate the provisions of this title if imposed on the existing dealer"). The problem for Priority is that there is one condition that the General Assembly unambiguously exempted from the reach of the statue: the exercise of a customary right of refusal. It did so by tacking on a key proviso at the end of Subdivision 3a: "Notwithstanding the foregoing, an exercise of the right of first refusal by the manufacturer * * * pursuant to §46.2-1569.1 shall not be considered the imposition of a condition prohibited by this section." *Id.*

Priority, however, presses on. It insists that by carving out an exception for rights of first refusal exercised "pursuant to § 46.2-1569.1," Subdivision 3a allows a would-be purchaser to do indirectly what it could not do directly under Section 1569.1: contest whether the manufacturer satisfied the mandate to provide the selling dealer with adequate consideration under Section 1569.1(2).

But that defies the statute's text and structure, to say nothing of common sense. Priority reads "pursuant to § 46.2-1569.1" as if that clause contemplated only Section 1569.1's itemized requirements, not its accompanying remedial scheme as well. But that is not how statutory construction works. Courts are to "examine [the] statute in its entirety, rather than by isolating particular words or

20

phrases." *Cummings* v. *Fulghum*, 540 S.E.2d 494, 496 (Va. 2001). That is

particularly so here because "[t]he term 'pursuant to' " demands a wider analytic

aperture. As the Virginia Supreme Court has recognized, "the term 'pursuant to'

means 'in the course of carrying out: in conformance to or agreement with:

according to' and, when used in a statute, is a restrictive term." *Bray* v. *Brown*,

521 S.E.2d 526, 528 (Va. 1999) (quoting Black's Law Dictionary 1237 (6th ed.

1990)). To "conform" with Section 1569.1 demands more than hewing to its

laundry list of mandates; it requires honoring the Section's remedial scheme as

well.

   Applying those rules to Subdivision 3a yields a more modest and sensible

construction than the one Priority presses. Subdivions 3a's proviso that "an

exercise of the right of first refusal by the manufacturer * * * pursuant to §46.2-

1569.1 shall not be considered the imposition of a condition prohibited by this

section," Va. Code Ann. § 46.2-1569(3a), means that the exercise of a right of first

refusal that has been challenged by the appropriate parties with standing "pursuant

to Section 1569.1" and found valid will not be deemed a violation of the Act. That

interpretation not only honors the plain language of the provision but it also

respects the "settled rule in th[e] Commonwealth that every provision in or part of

a statute shall be given effect if possible." *Travelers Prop. Cas. Co. of Am.* v. *Ely*,

666 S.E.2d 523, 527 (Va. 2008). After all, Priority's view of Subdivision 3a

effectively guts the carefully crafted remedial scheme and standing limitations that it tacitly concedes apply to Section 1569.1. Priority Br. 15. Construing "pursuant to § 46.2-1569.1" to mean a right of first refusal exercised and deemed valid pursuant to *all* of Section 1569.1's requirements—substantive and remedial— avoids the senseless statutory redundancy that Priority's view invites.

The structure of the Act confirms that Subdivision 3a does not mean what Priority thinks it means. Keep in mind that under Section 1569.1(2), a selling-dealer unhappy with the consideration offered by a manufacturer would be entitled to no more than an order requiring the manufacturer to match the putatively higher initial offer. But under Priority's view of Subdivision 3a, a dissatisfied purchaser can seek much, much more: lost-profits damages that, in the case of Priority, supposedly total tens of millions of dollars. J.A. 15-20. There is no reason why the General Assembly would have wanted to grant the would-be purchaser such a colossal windfall after having carefully tailored such a modest remedy for the party truly injured by a manufacturer's inadequate consideration. Certainly the District Court could think of none. J.A. 952.

Priority's argument also renders Section 1569.1(4) hopeless surplusage. With that provision, the General Assembly set forth a very specific remedy for a disappointed purchaser that, like Priority, was trumped by a manufacturer's right of first refusal: the manufacturer must pay the purchaser's "reasonable expenses,

22

including attorney's fees * * * incurred * * * prior to the manufacturer's or distributor's exercise of its right of first refusal in negotiating and implementing the contract for the proposed sale or transfer of the dealership or dealership assets." Va. Code Ann. § 46.1569.1(4). Priority received just that here. Although Priority initially complained that Ford had shorted it on its expenses, J.A. 20-21, the two sides amicably resolved that claim. J.A. 967-968 n.1. And now that Priority has received what it agrees is reasonable reimbursement for its expenses, it has no other damages it can recover.

Yet Priority still presses on for millions in lost profits. But the Virginia Supreme Court has held that "where a statute creates a right and provides a remedy for the vindication of that right, then that remedy is exclusive unless the statute says otherwise." *School Bd. of Norfolk* v. *Giannoutsos*, 380 S.E.2d 647, 649 (Va. 1989). In short, we cannot improve on what the Third Circuit said when it rejected an identical argument under Pennsylvania's franchise statute: "In reality, it is not the loss that [Kimnach] might have suffered that [Priority] seeks. Rather, [it] wants to recover the benefit of [its] bargain." *Rosado*, 337 F.3d at 296. But "[u]nfortunately for [Priority], the Act only grants prospective purchasers the right to * * * reimbursement of reasonable expenses incurred from negotiating the original sales contract." *Id.* Priority cannot use Subdivision 3a to bootstrap its way to a larger recovery than Section 1569.1(4) allows.

23

Against the statute's text and structure, all Priority offers is a parade of horribles. According to Priority, the District Court's interpretation "essentially grants manufacturers the ability to fabricate an exercise of the right of first refusal to escape liability for an improper rejection of a prospective dealer pursuant to § 46.2-1569(3) and §46.2-1569(3a)." Priority Br. 17. Not so. The District Court's interpretation simply funnels all challenges to a manufacturer's exercise of the right of first refusal into the statutory regime the General Assembly specifically crafted: Section 1569.1. If a manufacturer "fabricate[s]" a sham exercise of the right of first refusal—whatever that may mean—then the seller-dealer can simply contest the adequacy of that offer pursuant to Section 1569.1(2). True, that leaves the disappointed purchaser unable to stop the deal if the seller-dealer is happy with the manufacturer's offer. But that is as it should be. After all, dealers who have invested millions of dollars into their franchise are unlikely to idly accept a sham offer.

Without ever quite saying so, Priority seems to suggest that dealers are an easily cowed bunch, who are unduly susceptible to wily manufacturers making sham offers designed to "grind the seller into submission." Priority Br. 17. But automobile dealers—like Priority itself—are not the unsophisticated rubes that Priority's brief intimates. And there is nothing in the text, structure, or legislative history of the Virginia Motor Vehicle Franchise Law to suggest that the General

Assembly thought selling dealers were so incapable of assessing and vindicating their own interests that the legislature needed to give would-be purchasers a roving commission to police the sufficiency of a manufacturer's offer. This Court should therefore affirm the District Court's judgment that "Priority does not have standing under Virginia Code § 46.2-1569(3a) to sue Ford based on the facts alleged here." J.A. 953.

### B. Cases Interpreting Similar State Motor Vehicle Franchise Statutes Confirm That Priority Does Not Have Standing.

The District Court's holding joins good company. Virtually every court to have reached this question under similar state statutes has concluded that a would-be purchaser does not have standing to challenge a manufacturer's exercise of its right of first refusal. Ford below cited seven different cases holding as much,[5] and the District Court discussed one of them—*Rosado*—at length. J.A. 944-946. On appeal, though, Priority does not distinguish, discuss, or cite even one of these cases. Priority's silence is telling.

Below, Priority dismissed the consistent holdings of federal and state courts with a single sentence: Those cases are not "persuasive to determine the legal

---

[5] Dkt. No. 14 at 9-10 (citing *Rosado* v. *Ford Motor Co.*, 337 F.3d 291 (3d Cir. 2003); *Fresno Motors, LLC* v. *Mercedes-Benz USA, LLC*, 852 F. Supp. 2d 1280 (E.D. Ca. 2012); *Hand* v. *Chrysler Corp.*, 30 F. Supp. 2d 667 (D. Vt. 1998); *Blair* v. *Gen. Motors Corp.*, 838 F. Supp. 1998 (W.D. Ky. 1993); *Tacoma Auto Mall, Inc.* v. *Nissan N. Am., Inc.*, 279 P.3d 487 (Wash. Ct. App. 2012); *Beard Motors, Inc.* v. *Toyota Motor Distributors, Inc.*, 480 N.E.2d 303 (Mass. 1985); *Roberts* v. *Gen. Motors Corp.*, 643 A.2d 956 (N.H. 1994)).

issues of this matter because the cases are from states that do not have statutory protections for prospective dealers that are akin to" Subdivision 3a. Dkt. No. 16 at 15 (emphasis omitted). But that simply is not so. *Rosado* is particularly apt, which is presumably why the District Court dedicated two whole pages to it. J.A. 944-946. In *Rosado*, the Pennsylvania Board of Vehicles Act provided, like the Virginia Motor Vehicle Franchise Act, that a manufacturer would be permitted to exercise its right of first refusal so long as " 'the exercise of the right of first refusal will result in the dealer and the dealer's owners receiving the same or greater consideration as they have contracted to receive in connection with the proposed' " sale of the dealership. *Rosado*, 337 F.3d at 293 (quoting 63 Pa. Stat. Ann. § 818.16)). And even more broadly than Subdivision 3a, the Pennsylvania Act allowed " '[a]ny person who is or may be injured by a violation of a provision of this Act' " to " 'bring an action for damages and equitable relief.' " *Id.* at 294 (quoting 63 Pa. Stat. Ann. § 818.29).

Ford exercised its right of first refusal and Rosado—the prospective purchaser—sued, arguing that the selling franchisee's owners "received less compensation than they would have had they sold to" Rosado. *Id.* at 292. In claiming he had standing to invoke the selling franchisee's owners' right to receive equivalent compensation, Rosado argued that the "any person" in the Pennsylvania

Act truly meant "any person," including a prospective purchaser like him. *Id.* at 294.

The Third Circuit disagreed, holding that "[a] prospective purchaser lacks standing to claim that the selling dealer did not receive the same or greater consideration." *Id.* at 296. As the court explained, the equal consideration requirement in the Pennsylvania Act "protects dealers by creating two prospective purchasers for every offer they receive" and reflects the reality that "[i]n most cases, the dealer would largely be indifferent to the identity of the new owner" so long as it receives equivalent consideration for the sale. *Id.* at 294-295. And because Rosado as the prospective purchaser was not the party the Pennsylvania legislature intended to protect with the equal consideration requirement, Rosado did not have standing to challenge the consideration Ford paid. *Id.* at 296.

What's more, the Third Circuit held that Rosado did not have standing to invoke the selling franchisee's right to equal consideration even though the court had previously held that a prospective purchaser *does* have standing to challenge a manufacturer's unreasonable refusal to approve a prospective purchaser as a dealer—just as the prospective purchaser under Virginia law has standing to contest outright refusals. *Compare id.* at 295 (citing *Big Apple BMW, Inc.* v. *BMW of N. Am., Inc.*, 974 F.2d 1358, 1382-83 (3d Cir. 1992)), *with* Va. Code Ann. § 46.2-1569(3a). The Court explained why the legislature would draw that

27

sensible distinction: "[t]he withholding consent provision implies at least some concern for prospective purchasers by reference to those who are qualified and who are capable of obtaining a dealer's license, and might appear to give some protection to prospective purchasers." *Id.* But standing under the Pennsylvania withholding-consent provision did "not logically carry over to the first refusal setting." *Id.*

*Rosado* is this case. As the District Court rightly observed, *Rosado* "specifically discusses the interplay * * * between a manufacturer's exercise of its right of first refusal, a prospective buyer's challenge to this exercise, and the adequacy of the manufacturer's consideration to the selling dealer for the sale of the dealership," the same interplay at issue here. J.A. 945-946. And *Rosado* was decided against the prospective purchaser. But yet Priority offers no basis—much less a persuasive one—to distinguish the Third Circuit's opinion.

*Rosado* is no outlier. Other states with broad remedial provisions in their motor vehicle franchise acts also deny prospective purchasers standing to challenge a manufacturer's exercise of its right of first refusal. The New Hampshire Dealership Act, for example, like the Pennsylvania Act, conveys standing upon " 'any person who is injured in his business or property by a violation of' " the Act. *Roberts* v. *Gen. Motors Corp.*, 643 A.2d 956, 958 (N.H. 1994) (quoting N.H. Rev. Stat. Ann. § 357-C:12)). But despite this broad grant of

28

standing to "any person," the New Hampshire Supreme Court concluded that a disappointed prospective purchaser—even one who was otherwise qualified to operate a dealership—did not have standing to challenge a franchisor's right of first refusal. *Id.* at 958-959.

The New Hampshire high court reasoned that it was required to " 'focus on the statute as a whole, not on isolated words and phrases.' " *Id.* at 958 (citation omitted). And when the court widened its aperture beyond the phrase "any person," it readily concluded the New Hampshire Act was intended "to protect the investment and property interests of those who are already dealers," not prospective dealers. *Id.* at 959. In so holding, the New Hampshire court took comfort knowing that its conclusion fell in line with "the great majority of other States," even though those states' statutes were not "a mirror image" of New Hampshire's. *Id.*

The Massachusetts Supreme Judicial Court, too, has held that despite its franchise statute's similarly broad standing provision, a prospective purchaser did not have standing to challenge a manufacturer's rejection of its application. *Beard Motors, Inc.* v. *Toyota Motor Distribs., Inc.*, 480 N.E.2d 303, 305-306 (Mass. 1985) (citing Mass. Gen. Laws ch. 93B, § 12A). The Court explained that despite the seemingly broad language, "the injuries alleged by the [prospective purchaser]— primarily the loss of anticipated profits from the sale of Toyotas and from capital

appreciation in the value of the Toyota dealership * * *—are not injuries within the area of legislative concern that resulted in the enactment of" Massachusetts' franchise statute.  *Id.* at 306-307.  The prospective purchaser therefore "d[id] not have standing." *Id.* at 307.

The list goes on.  The New Mexico and New Jersey appellate courts, too, have held that their state motor vehicle franchise laws do not provide protection for prospective purchasers.[6]  And district courts from Vermont to Kentucky to California have held that disappointed prospective purchasers do not have standing to sue manufacturers when they exercise their rights of first refusal over selling dealers' assets.[7]  The reasoning in these cases is the same: a motor vehicle franchise act is generally designed to protect selling franchisees, not prospective purchasers.  If the franchisee is unwilling to sue to assert its own rights, the would-be purchaser has no business suing in the franchisee's stead.[8]

---

[6] *See Key* v. *Chrysler Motors Corp.*, 918 P.2d 350, 364 (N.M. 1996); *Tynan* v. *Gen. Motors Corp.*, 591 A.2d 1024, 1031 (N.J. App. Div. 1991), *rev'd in part on other grounds*, 604 A.2d 99 (N.J. 1992).

[7] *See Fresno Motors, LLC* v. *Mercedes-Benz USA, LLC*, 852 F. Supp. 2d 1280, 1303-04 (E.D. Cal. 2012); *Hand* v. *Chrysler Corp.*, 30 F. Supp. 2d 667, 669, 672 (D. Vt. 1998); *Blair* v. *Gen. Motors Corp.*, 838 F. Supp. 1196, 1199 (W.D. Ky. 1993).

[8] *See Tynan*, 591 A.2d at 1031 ("[W]e conclude that the Legislature, like those of other states, did not intend the Act to protect a prospective transferee."); *Fresno Motors*, 852 F. Supp. 2d at 1306 (California statute governing rights of first refusal "was enacted to ensure further protection to existing and newly licensed dealers against manufacturers and distributors, not to prospective dealers or franchisees");

Priority cannot dismiss this wealth of case law simply because it comes from outside the Commonwealth. The Virginia Supreme Court often finds "the weight of authority from other jurisdictions that have dealt with [an] issue" to be persuasive, particularly when they are in accord. *Recalde* v. *ITT Hartford*, 492 S.E.2d 435, 437 (Va. 1997). For Priority to suggest that the Virginia Supreme Court would be unswayed by the considered, consistent judgment of its sister courts is to ignore how the court decides cases of first impression. *See*, *e.g.*, *Wyatt* v. *McDermott*, 725 S.E.2d 555, 559-560 (Va. 2012) (following the "overwhelming majority of the high courts of our sister states that have considered the issue" in deciding to recognize a claim that "has not heretofore been brought in Virginia").

## II. THE DISTRICT COURT CORRECTLY REJECTED PRIORITY'S TORT CLAIMS FOR INTERFERENCE WITH CONTRACT AND BUSINESS EXPECTANCY BECAUSE FORD DID NOT USE IMPROPER METHODS NOR IS IT A THIRD-PARTY TO THE AGREEMENT.

Priority's tort claims for interference with contract and business expectancy fail for similar reasons. Under Virginia law, for Priority to maintain a claim for tortious interference, Ford must have "intentionally interfered" through "improper

---

*Hand*, 30 F. Supp. 22d at 672 (rejected buyer did not have standing to object to manufacturer's exercise of its right of first refusal because "the statute's purpose is to protect a new motor vehicle dealer with a sales and service agreement from unreasonable and unfair conduct by the manufacturer"); *Blair*, 838 F. Supp. at 1199 (rejected buyer lacked standing to sue over manufacturer's exercise of its right of first refusal because the Kentucky Automobile Dealer Act "is designed to protect dealers in their direct contractual relationships with the manufacturer" and "does not contemplate the protection of third parties").

methods" with Priority's agreement with Kimnach, *Duggin* v. *Adams*, 360 S.E.2d

832, 836-837 (Va. 1987), or engaged in "intentional misconduct" that caused

Priority to lose its expected opportunity to operate a Ford dealership, *Commercial*

*Bus. Sys., Inc.* v. *Halifax Corp.*, 484 S.E.2d 892, 896 (Va. 1997). Ford also must

have been a stranger to the transaction between Priority and Kimnach; there can be

no tortious interference unless the interferer is a true "third party" to the business

relationship. *Chaves* v. *Johnson*, 335 S.E.2d 97, 102 (Va. 1985) (citing

*Restatement (Second) of Torts* § 766 (1977)).

Priority's tort claims flunk both requirements. When Ford exercised its

customary right of first refusal, it did not deploy any nefarious method of

interfering with Priority's contract with Kimnach or engage in misconduct that

caused Priority to lose its expected Ford dealership. Rather, all Ford did was

exercise a right given to it both by contract and statute. There was nothing

improper—much less tortious—about that. Moreover, Ford was no third party to

the agreement between Priority and Kimnach. To the contrary, Priority could not

obtain its expected profits under the purchase agreement unless Ford was willing to

appoint Priority a Ford dealer. Because tortious interference claims exist to deter

*strangers* from interfering with business opportunities, Priority's tort claims were

correctly dismissed as a matter of law.

**A.    Ford Did Not Employ An Improper Method Of Interfering With Priority's Business Relationship With Kimnach By Exercising Its Contractual And Statutory Right Of First Refusal.**

Under Virginia law, Priority must do more than allege that Ford intentionally caused Kimnach to renege on its purchase agreement with Priority. Rather, Ford had to do so through "improper methods." *Duggin*, 360 S.E.2d at 836. That is because Ford had an existing business relationship with Kimnach that it was seeking to protect when it exercised its right of first refusal. Where, as here, "the defendant has its own contractual or commercial relationship with the other party to the plaintiff's contract, a balance must 'be struck between the social desirability of protecting the business relationship [of the plaintiff and the other party], on one hand, and the interferer's freedom of action [with the other party] on the other.' " *Lewis-Gale Med. Ctr.*, 710 S.E.2d at 722 (quoting *Chaves*, 335 S.E.2d at 103). The "improper methods" criterion strikes that balance by requiring that the interferer's meddling be not just intentional, but "illegal or * * * outside the accepted practice[s]" of the " 'the rough-and-tumble world comprising the competitive marketplace.' " *Id.* (quoting *Williams* v. *Dominion Tech. Partners, LLC*, 576 S.E.2d 752, 758 (Va. 2003)).

Priority, citing *Chaves*, claims that whether Ford's methods of inducing Kimnach to terminate its purchase agreement with Priority were justified is an affirmative defense Ford is required to prove, not an element of the tort that

33

Priority is required to plead.  Priority Br. 35-37.  But Priority ignores the more-recent teachings of the Virginia Supreme Court.  That court has held that although *Chaves*' statement about giving due regard to the interferer's freedom of action was "addressed * * * to the availability of an affirmative defense of privilege or justification," it likewise "applies with equal force to determining what the law will deem to be an improper method by the interferer when there is an existing commercial relationship between it and the other party to the contract with the plaintiff."  *Lewis-Gale Med. Ctr.*, 710 S.E.2d at 722.  And because Ford has an existing commercial relationship with Kimnach, this Court may consider whether Ford was privileged to take the actions it did in passing on Priority's *prima facie* case—a case Priority was required to plausibly plead.  *Id.*

With that brush cleared, there was obviously nothing improper about Ford exercising its right of first refusal to disrupt the Priority-Kimnach agreement.  To be sure, as Priority observes (Priority Br. 33), an interferer's methods do not have to be inherently tortious or illegal to be improper.  *Maximus, Inc.* v. *Lockheed Info. Mgmt. Sys. Co.*, 493 S.E.2d 375, 378-379 (Va. 1997).  But if not inherently tortious or illegal, the interferer's methods *do* have to fit one of the recognized improper means of doing business, such as "violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary

34

relationship." *Dunn, McCormack & MacPherson* v. *Connolly*, 708 S.E.2d 867, 870 (Va. 2011); *accord Preferred Sys. Solutions, Inc.* v. *GP Consulting, LLC*, 732 S.E.2d 676, 688 (Va. 2012).

Priority never suggests—and for good reason—that Ford's actions were akin to anything on that list. Priority does not claim, for instance, that Ford threatened Kimnach with violence if Kimnach refused to accede to Ford's right of first refusal. Instead, all Priority alleges is that Ford improperly invoked its right of first refusal by not paying Kimnach the same consideration Priority had offered. J.A. 18-19; Priority Br. 29-30. Of course, Ford did no such thing. But even if it did, *offering* to pay a dealer millions of dollars for its assets—even if less than what someone else would have paid—bears no similarity to violence, intimidation, and the other sinister acts this tort is reserved for. *Dunn, McCormack & MacPherson*, 708 S.E.2d at 870-871. And when that multi-million-dollar offer is actually *accepted*—without any threat of violence or unlawful coercion—the tortious interference claim comes perilously close to frivolous.

But the problem with Priority's theory runs deeper still, for Priority's interference claim is essentially a repackaged version of its franchise-statute claim. But as we have explained, the Virginia General Assembly intended the equivalent-consideration requirement of Section 1569.1 to protect selling franchisees like Kimnach, not prospective purchasers like Priority. *Supra* 16-31. That is

significant because it demonstrates that the General Assembly struck a balance in favor of Ford's freedom of action. *See Lewis-Gale Med. Ctr.*, 710 S.E.2d at 722; *see also Tynan*, 591 A.2d at 1034 ("[W]e can find no basis to authorize, as a matter of judge-made law, a tort remedy for the benefit of a prospective franchisee who is not protected by the [New Jersey Franchise Practices] Act itself.").[9] For Priority to state a claim for tortious interference, it has to allege at the very least behavior more coercive than a bare violation of Section 1569.1(2).

To do that, Priority points enthusiastically to *Big Apple BMW, Inc.* v. *BMW of North America, Inc.*, 974 F.2d 1358 (3d Cir. 1992). There, Priority asserts, the Third Circuit held that the "exercise of a right of first refusal in violation of law could constitute tortious interference." Priority Br. 42. Here's the problem for Priority: The Third Circuit has held—twice—that *Big Apple BMW* said no such thing. First in *Crivelli* v. *General Motors Corp.*, 215 F.3d 386 (3d Cir. 2000), the Third Circuit rejected this expansive view of *Big Apple BMW* by clarifying that the manufacturer in that case "did not assert a contractual right of first refusal." *Id.* at

_____

[9] At times, Priority comes close to suggesting that Ford violated the statute by waiting too long to invoke its right of first refusal. Priority is incorrect, but this Court need not resolve the dispute. The Virginia Supreme Court has recognized that contractual foot faults like these are not so beyond the pale as to be an "improper method" of interfering with business relations. *See Preferred Sys. Solutions*, 732 S.E.2d at 688 (the "breach of a noncompete clause is not in itself an improper method or means"); *see also Commerce Funding Corp.* v. *Worldwide Security Servs. Corp.*, 249 F.3d 204, 214 (4th Cir. 2001) (company's actions that were "unwise" did not "rise to the level of any of the more egregious forms of improper conduct identified in Virginia law").

395.  That is a key fact.  As the Third Circuit explained, where—as here—the manufacturer "assert[s] a bona fide right of first refusal designed to protect its interest in its franchise," the exercise is privileged and "does not subject [the manufacturer] to liability" for tortious interference.  *Id.*  Lest there be any doubt about the rule of decision that governs here, the Third Circuit several years later in *Rosado* reaffirmed that it meant what it said in *Crivelli*.  There, the court held that *Crivelli* "mandates denial of recovery" on a prospective purchaser's tortious interference claim where the claim is based—as it is here—on the manufacturer's failure to pay equal consideration to the selling franchisee.  337 F.3d at 296.

Priority never addresses—let alone cites—*Crivelli* or *Rosado*.  But it's certainly not for lack of notice.  Below, both Ford and the District Court pointed to those decisions as proof that the Third Circuit had repudiated Priority's view of *Big Apple BMW*.  J.A. 960.  We would have expected Priority to join issue with *Crivelli* and *Rosado* in its opening brief had it any plausible response.  We trust Priority will not wait until its reply brief to do so.  *Cf. Gonzales-Servin* v. *Ford Motor Co.*, 662 F.3d 931, 934 (7th Cir. 2011) (Posner, J.) (" 'The ostrich-like tactic of pretending that potentially dispositive authority against the litigant's contention does not exist is as unprofessional as it is pointless.' ") (citation omitted).

37

**B.    Ford Could Not Tortiously Interfere With Priority's Business Relationship With Kimnach Because It Was Not A Stranger To The Relationship.**

Priority's tort claims also fail because Ford was not a third party to Priority and Kimnach's business relationship.  As the District Court noted, the relationship that Ford "interfered" with was not so much Kimnach's sale to Priority, but the franchise relationship that Priority expected to have *with Ford* once the sale closed. J.A. 954.  Because under Virginia law a defendant cannot interfere with its own contract or business expectancy, *Fox* v. *Deese*, 362 S.E.2d 699, 708 (Va. 1987), Priority's tort claims are untenable as a matter of law.

Priority asserts that because Ford was not a party to the purchase agreement between Priority and Kimnach, "tortious interference is the proper claim."  Priority Br. 34.  But in support of that assertion, Priority relies almost exclusively on an unpublished Ninth Circuit decision, *McKinney* v. *Anheuser-Busch, Inc.*, 1991 WL 268700 (9th Cir. Dec. 16, 1991).  Although the Ninth Circuit held in *McKinney*— over a dissent—that a beer manufacturer was an independent third party to its distributor's agreement to sell its assets to a prospective buyer, *id.* at *2, *McKinney* was not even persuasive precedent when it was decided.  *See* Ninth Circuit R. 36-3(c).  Nor has it stood the test of time.  In a published opinion issued nearly ten years after *McKinney*, the Ninth Circuit held that "the core of intentional interference with business torts is interference with an economic relationship by a

third-party *stranger* to that relationship, so that an entity with a direct interest or involvement in that relationship is not usually liable for harm caused by pursuit of its interests." *Marin Tug & Barge, Inc.* v. *Westport Petroleum, Inc.*, 271 F.3d 825, 832 (9th Cir. 2001).

Indeed, on identical facts and legal theories as *McKinney*—Anheuser-Busch's refusal to approve a transferee of an Anheuser-Busch wholesalership—the Florida District Court of Appeal concluded in a published decision that Anheuser-Busch could not be liable for tortious interference. *Genet Co.* v. *Anheuser-Busch, Inc.*, 498 So. 2d 683, 684 (Fla. Dist. Ct. App. 1986). The Florida court held that because Anheuser-Busch "had the contractual right * * * to approve or disapprove any proposed transfer of [the] wholesalership," Anheuser-Busch "as a matter of law * * * cannot be liable for tortious interference with the agreement" to sell the wholesalership. *Id.* Similarly, because Anheueser-Busch was the "source of the business opportunity which [the prospective purchaser sought]," the "tort of willful interference with a business relationship does not exist." *Id.*; *accord R.A., Inc.* v. *Anheuser-Busch, Inc.*, 556 N.W.2d 567, 571 (Minn. Ct. App. 1996) (applying *Genet* to the sale of a Minnesota beer distributorship).[10]

---

[10] Given the Minnesota Court of Appeals' adoption of *Genet* in 1996, Priority's reliance on the 1989 case of *Northside Mercury Sales & Service, Inc.* v. *Ford Motor Co.*, 871 F.2d 758, 761 (8th Cir. 1989), is anachronistic. Priority Br. 39-40. In any event, it does not appear that Ford invoked the stranger-to-the-relationship principle in *Northside Mercury*, making the case even more irrelevant.

Applying the principles espoused in *Genet*, multiple courts across the country have held that a motor vehicle franchisor is not liable for tortious interference when it declines to approve a prospective purchaser because the franchisor is not a stranger to the franchisee and purchaser's business relationship. The Kansas Supreme Court, for instance, has held that where a vehicle manufacturer declined to approve a prospective purchaser of a franchisee's assets, the manufacturer could not be liable for tortious interference because the potential profit the purchaser expected from future sales at the dealership "was only to be gained through [the manufacturer's] approval of a franchise agreement." *Noeller* v. *GMC Truck & Coach Div.*, 772 P.2d 271, 277 (Kan. 1989). Hence the manufacturer's interference "did not arise from a relationship between [the purchaser] and a third person, but from [the purchaser's] potential relationship with [the manufacturer] via the prospective franchise agreement." *Id.* at 276.

The Eleventh Circuit, New York Appellate Division, and multiple district courts all concur. Each has held that a motor vehicle franchisor cannot tortiously interfere with a selling franchisee's asset purchase agreement because the franchisor is not a stranger or third party to those agreements or business expectancies.[11]

---

[11] *See Ernie Haire Ford, Inc.* v. *Ford Motor Co.*, 260 F.3d 1285, 1294 (11th Cir. 2001) (applying *Genet* and rejecting selling franchisee's claims for tortious interference); *Morse* v. *Ted Cadillac, Inc.*, 537 N.Y.S.2d 239, 240 (N.Y. App. Div.

Against all this precedent, Priority confidently asserts that Virginia would take a different tack. Priority Br. 34, 37. But the out-of-state cases we have cited were based largely on Section 766 of the *Second Restatement of Torts*, the section on which Priority so heavily leans. Priority Br. 38; *Noeller*, 772 P.2d at 276 (basing its holding on Section 766); *Morse*, 537 N.Y.S.2d at 240 (same). Moreover, the weight of authority from other states makes perfect sense. After all, were Priority correct, a disappointed prospective purchaser would *always* state a *prima facie* case for tortious interference any time a manufacturer exercises its statutory and contractual right of first refusal. That, in turn, would mean that the manufacturer would have to prove the rightfulness of its exercise as an affirmative defense in every case, miring the manufacturer in expensive and time-consuming discovery and motions practice. A categorical rule that a manufacturer cannot tortiously interfere with its selling franchisee's purchase agreements avoids that wasteful result and keeps tortious interference claims from negating

_____

1989) (tortious interference action against manufacturer did not lie because manufacturer "simply exercised its right to refuse to enter into a dealership franchise agreement with the" prospective purchaser); *Pasqualetti* v. *Kia Motors Am., Inc.*, 663 F. Supp. 2d 586, 602-603 (N.D. Ohio 2009) (agreeing with *Genet* and *Noeller* that "[a] franchisor does not act as a 'third party' or 'outsider' when approving or denying a prospective franchisee's application" and, as a result, "[a]ny effect that decision might have on other contracts * * * cannot rise to the level of tortious interference"); *Fresno Motors*, 852 F. Supp. 2d at 1303 (manufacturer was "entitled to judgment as a matter of law with respect to the [prospective purchaser's] tortious interference claims" because the manufacturer "was not a stranger to the contractual relationship between" the prospective purchaser and the selling franchisee).

41

manufacturers' contractual and statutory rights.  *See Fresno Motors*, 852 F. Supp.

2d at 1302 (explaining that holding a manufacturer liable for tortious interference

for exercising its right of first refusal would essentially eliminate the

manufacturer's statutory right of first refusal "as the lawful exercise of every right

of first refusal necessarily establishes the elements of tortious interference with

contract").

## CONCLUSION

For the foregoing reasons, the judgment below should be affirmed.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary.  Nothing in Priority's brief calls into question

the District Court's comprehensive, well-reasoned opinion and Priority's

arguments have been consistently rejected by the courts to consider them.  Oral

argument therefore would not significantly aid the decisional process.

Respectfully submitted,

KURT D. WILLIAMS
BERKOWITZ OLIVER WILLIAMS SHAW
  & EISENBRANDT LLP
2600 Grand Boulevard, Suite 1200
Kansas City, MO 64108
(816) 561-7007


August 23, 2013

/s/ Christopher T. Handman
CHRISTOPHER T. HANDMAN
SEAN MAROTTA
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5719
chris.handman@hoganlovells.com

Counsel for Defendant-Appellee
Ford Motor Company

42

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 10,126 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in Times New Roman 14-point font.

/s/ Christopher T. Handman
Christopher T. Handman

**Statutory Addendum**

**Va. Code Ann. § 46.2-1569**

§ 46.2-1569. Other coercion of dealers; transfer, grant, succession to and cancellation of dealer franchises; delivery of vehicles, parts, and accessories.

Notwithstanding the terms of any franchise agreement, it shall be unlawful for any manufacturer, factory branch, distributor, or distributor branch, or any field representative, officer, agent, or their representatives:

1. To coerce or attempt to coerce any dealer to accept delivery of any motor vehicle or vehicles, parts or accessories therefor, or any other commodities, which have not been ordered by the dealer.

2. To coerce or attempt to coerce any dealer to enter into an agreement with the manufacturer, factory branch, distributor, or distributor branch, or representative thereof by threat to take or by taking any action in violation of the chapter, or by any other act unfair or injurious to the dealer. If a manufacturer, factory branch, distributor, or distributor branch conditions the grant of a new franchise to a dealer on the dealer's consent (i) to provide a site control agreement as defined in subdivision 10, (ii) to provide a written agreement containing an option to purchase the franchise of the dealer, provided, however, that agreements pursuant to § 46.2-1569.1 shall be permitted, or (iii) to provide a termination agreement to be held by the manufacturer, factory branch, distributor, or distributor branch for subsequent use, it shall be considered coercion and an act that is unfair and injurious to the dealer; provided, however, that the provisions of § 46.2-1572.3 related to the good faith settlement of disputes shall apply to the agreements described in clauses (i), (ii), and (iii) of this subdivision, mutatis mutandis. This subdivision shall not apply to any agreement the enforcement of which is subject to the jurisdiction of a United States Bankruptcy Court.

2a. To coerce or attempt to coerce any dealer to join, contribute to, or affiliate with any advertising association.

2b. To coerce or require any dealer to establish in connection with the sale of a motor vehicle prices at which the dealer shall sell products or services not manufactured or distributed by the manufacturer, factory branch, distributor, or distributor branch, whether by agreement, program, incentive provision, or otherwise.

2c. To coerce or require any dealer, whether by agreement, program, incentive provision, or otherwise, to construct improvements to its facilities or to install new signs or other franchisor image elements that replace or substantially alter those improvements, signs, or franchisor image elements completed within the preceding 10 years that were required or approved by the manufacturer, factory branch, distributor, or distributor branch or one of its affiliates. If a manufacturer, factory branch, distributor, or distributor branch offers incentives, or other payments under a program offered after the effective date of this subdivision and available to more than one dealer in the Commonwealth that are premised wholly or in part on dealer facility improvements or installation of franchisor signs or other franchisor image elements, a dealer that constructed improvements or installed signs or other franchisor image elements required by or approved by the manufacturer, factory branch, distributor, or distributor branch and completed within the 10 years preceding the program shall be deemed to be in compliance with the program requirements pertaining to construction of facilities or installation of signs or other franchisor image elements that would replace or substantially alter those previously constructed or installed within that 10-year period. This subdivision shall not apply to a program that provides lump sum payments to assist dealers in making facility improvements or to pay for signs or franchisor image elements when such payments are not dependent on the dealer selling or purchasing specific numbers of new vehicles and shall not apply to a program that is in effect with more than one dealer in the Commonwealth on the effective date of this subdivision, nor to any renewal or modification of such a program.

3. To prevent or refuse to approve the sale or transfer of the ownership of a dealership by the sale of the business, stock transfer, or otherwise, or the transfer, sale, or assignment of a dealer franchise, or a change in the executive management or principal operator of the dealership, unless the franchisor provides written notice to the dealer of its objection and the reasons therefor by certified mail or overnight delivery or other method designed to ensure delivery to the dealer at least 30 days prior to the proposed effective date of the transfer, sale, assignment, or change. No such objection shall be sufficient unless the failure to approve is reasonable. Notwithstanding the provisions of subsection D of § 46.2-1573, the only grounds that may be considered reasonable for a failure to approve are that an individual who is the applicant or is in control of an entity that is an applicant (i) lacks good moral character, (ii) lacks reasonable motor vehicle dealership management experience and qualifications, (iii) lacks financial ability to be the dealer, or (iv) fails to meet the standards otherwise established by this title to be a dealer. No such objection shall be effective to prevent the sale, transfer, assignment, or change if the Commissioner has determined, if requested in writing by the dealer within 30

days after receipt of an objection to the proposed sale, transfer, or change, and after a hearing on the matter, that the failure to permit or honor the sale, transfer, assignment, or change is unreasonable under the circumstances. No franchise may be sold, assigned, or transferred unless (a) the franchisor has been given at least 90 days' prior written notice by the dealer as to the identity, financial ability, and qualifications of the proposed transferee on forms generally utilized by the franchisor to conduct its review, as well as the full agreement for the proposed transaction, and (b) the sale or transfer of the franchise and business will not involve, without the franchisor's consent, a relocation of the business.

3a. To impose a condition on the approval of the sale or transfer of the ownership of a dealership by the sale of the business, stock transfer, or otherwise if the condition would violate the provisions of this title if imposed on the existing dealer.

In the event the manufacturer, factory branch, distributor or distributor branch takes action to prevent or refuse to approve the sale or transfer of the ownership of a dealership by the sale of the business, stock transfer, or otherwise, or the transfer, sale or assignment of a dealer franchise, or a change in the executive management or principal operator of the dealership, without a statement of specific grounds for doing so that is consistent with subdivision 3 hereof or imposes a condition in violation of subdivision 3a hereof, that shall constitute a violation of this section. The existing dealer may request review of the action or imposition of the condition in a hearing by the Commissioner. If the Commissioner finds that the action or the imposition of the condition was a violation of this section, the Commissioner may order that the sale or transfer be approved by the manufacturer, factory branch, distributor, or distributor branch, without imposition of the condition. If the existing dealer does not request a hearing by the Commissioner concerning the action or the condition imposed by the manufacturer, factory branch, distributor, or distributor branch, and the action or condition was the proximate cause of the failure of the contract for the sale or transfer of ownership of the dealership, the applicant for approval of the sale or transfer or the existing dealer, or both, may commence an action at law for violation of this section. The action may be commenced in the circuit court of the city or county in which the dealer is located, or in any other circuit court with permissible venue, within two years following the action or the imposition of the condition by the manufacturer, factory branch, distributor, or distributor branch for the damages suffered by the applicant or the dealer as a result of the violation of this section by the manufacturer, factory branch, distributor, or distributor branch, plus the applicant's or dealer's reasonable attorney fees and costs of litigation. Notwithstanding the foregoing, an exercise of the right of first refusal by the manufacturer, factory branch, distributor, or

distributor branch pursuant to § 46.2-1569.1 shall not be considered the imposition of a condition prohibited by this section.

4. To grant an additional franchise for a particular line-make of motor vehicle in a relevant market area in which a dealer or dealers in that line-make are already located unless the franchisor has first advised in writing all other dealers in the line-make in the relevant market area. No such additional franchise may be established at the proposed site unless the Commissioner has determined, if requested by a dealer of the same line-make in the relevant market area within 30 days after receipt of the franchisor's notice of intention to establish the additional franchise, and after a hearing on the matter, that the franchisor can show by a preponderance of the evidence that after the grant of the new franchise, the relevant market area will support all of the dealers in that line-make in the relevant market area. Establishing a franchised dealer in a relevant market area to replace a franchised dealer that has not been in operation for more than two years shall constitute the establishment of a new franchise subject to the terms of this subdivision. The two-year period for replacing a franchised dealer shall begin on the day the franchise was terminated, or, if a termination hearing was held, on the day the franchisor was legally permitted finally to terminate the franchise. The relocation of a franchise in a relevant market area, whether by an existing dealer or by a dealer who is acquiring the franchise, shall constitute the establishment of a new franchise subject to the terms of this subdivision. This subdivision shall not apply to (i) the relocation of an existing dealer within that dealer's relevant market area if the relocation site is to be more than ten miles distant from any other dealer for the same line-make; (ii) the relocation of an existing dealer within that dealer's relevant market area if the relocation site is to be more distant than the existing site from all other dealers of the same line-make in that relevant market area; or (iii) the relocation of an existing new motor vehicle dealer within two miles of the existing site of the relocating dealer.

5. Except as otherwise provided in this subdivision and notwithstanding the terms of any franchise, to terminate, cancel, or refuse to renew the franchise of any dealer without good cause and unless (i) the dealer and the Commissioner have received written notice of the franchisor's intentions at least 60 days prior to the effective date of such termination, cancellation, or the expiration date of the franchise, setting forth the specific grounds for the action, and (ii) the Commissioner has determined, if requested in writing by the dealer within the 60-day period prior to the effective date of such termination, cancellation, or the expiration date of the franchise and, after a hearing on the matter, that the franchisor has shown by a preponderance of the evidence that there is good cause for the termination,

cancellation, or nonrenewal of the franchise. If any manufacturer, factory branch, distributor, or distributor branch takes action that will have the effect of terminating, canceling, or refusing to renew the franchise of any dealer (a) by use of a termination agreement executed by the dealer and obtained more than 90 days before the purported date of use, (b) by exercise of rights under a written option to purchase the franchise of a dealer, or (c) by exercise of rights under a site control agreement as defined in subdivision 10, that action shall be considered a termination, cancellation, or refusal to renew pursuant to the terms of this subdivision and subject to the rights, provisions, and procedures provided herein. In any case where a petition is made to the Commissioner for a determination as to good cause for the termination, cancellation, or nonrenewal of a franchise, the franchise in question shall continue in effect pending the Commissioner's decision or, if that decision is appealed to the circuit court, pending the decision of the circuit court. Where the termination, cancellation, or nonrenewal of a franchise will result from use of a termination agreement executed by the dealer and obtained more than 90 days before the purported date of use, exercise of rights under a written option to purchase the franchise of a dealer, or exercise of rights under a site control agreement as defined in subdivision 10, such use or exercise shall be stayed pending the Commissioner's decision or, if that decision is appealed to the circuit court, pending the decision of the circuit court, and its use or exercise will be allowed only where the franchisor has shown by a preponderance of the evidence that there is good cause for the termination, cancellation, or nonrenewal of the franchise. In any case in which a franchisor neither advises a dealer that it does not intend to renew a franchise nor takes any action to renew a franchise beyond its expiration date, the franchise in question shall continue in effect on the terms last agreed to by the parties. Notwithstanding the other provisions of this subdivision notice of termination, cancellation, or nonrenewal may be provided to a dealer by a franchisor not less than 15 days prior to the effective date of such termination, cancellation, or nonrenewal when the grounds for such action are any of the following:

a. Insolvency of the franchised motor vehicle dealer or filing of any petition by or against the franchised motor vehicle dealer, under any bankruptcy or receivership law, leading to liquidation or which is intended to lead to liquidation of the franchisee's business.

b. Failure of the franchised motor vehicle dealer to conduct its customary sales and service operations during its posted business hours for seven consecutive business days, except where the failure results from acts of God or circumstances beyond the direct control of the franchised motor vehicle dealer.

c. Revocation of any license which the franchised motor vehicle dealer is required to have to operate a dealership.

d. Conviction of the dealer or any principal of the dealer of a felony.

The change or discontinuance of a marketing or distribution system of a particular line-make product by a manufacturer or distributor, while the name identification of the product is continued in substantial form by the same or a different manufacturer or distributor, may be considered to be a franchise termination, cancellation, or nonrenewal. The provisions of this paragraph shall apply to changes and discontinuances made after January 1, 1989, but they shall not be considered by any court in any case in which such a change or discontinuance occurring prior to that date has been challenged as constituting a termination, cancellation or nonrenewal.

5a. To fail to provide continued parts and service support to a dealer which holds a franchise in a discontinued line-make for at least five years from the date of such discontinuance. This requirement shall not apply to a line-make which was discontinued prior to January 1, 1989.

5b. Upon the involuntary or voluntary termination, nonrenewal, or cancellation of the franchise of any dealer, by either the manufacturer, distributor, or factory branch or by the dealer, notwithstanding the terms of any franchise whether entered into before or after the enactment of this section, to fail to pay the dealer for at least the following:

(1) The dealer cost plus any charges by the franchisor for distribution, delivery, and taxes paid by the dealer, less all allowances paid to the dealer by the franchisor, for new and undamaged motor vehicles in the dealer's inventory acquired from the franchisor or from another dealer of the same line - make in the ordinary course of business within 18 months of termination;

(2) The dealer cost as shown in the price catalog of the franchisor current at the time of repurchase of each new, unused, undamaged, and unsold part or accessory if such part or accessory is in the current parts catalog and is still in the original, resalable merchandising package and in unbroken lots, except that in the case of sheet metal, a comparable substitute for the original package may be used;

(3) The fair market value of each undamaged sign owned by the dealer that bears a trademark, trade name or commercial symbol used or claimed by the franchisor if such sign was purchased from or at the request of the franchisor;

(4) The fair market value of all special tools and automotive service equipment owned by the dealer that were recommended and designated as special tools or equipment by the franchisor, if the tools and equipment are in usable and good condition, normal wear and tear excepted; and

(5) The reasonable cost of transporting, handling, packing, and loading of motor vehicles, parts, signs, tools, and special equipment subject to repurchase hereunder.

The provisions of this subdivision do not apply to a dealer who is unable to convey clear title to the property identified in this subdivision.

For purposes of this subdivision, a voluntary termination shall not include the transfer of the terminating dealer's franchised business in connection with a transfer of that business by means of sale of the equity ownership or assets thereof to another dealer.

5c. If the termination, cancellation, or nonrenewal of the dealer's franchise is the result of the termination, elimination, or cessation of a line-make by the manufacturer, distributor, or factory branch, then, in addition to the payments to the dealer pursuant to subdivision 5b, the manufacturer, distributor, or factory branch shall be liable to the dealer for the following:

(1) An amount at least equivalent to the fair market value of the franchise for the line-make, which shall be the greater of that value determined as of (i) the date the franchisor announces the action that results in termination, cancellation, or nonrenewal, (ii) the date the action that resulted in the termination, cancellation, or nonrenewal first became general knowledge, or (iii) the day 12 months prior to the date on which the notice of termination, cancellation, or nonrenewal is issued. In determining the fair market value of a franchise for a line-make, if the line-make is not the only line-make for which the dealer holds a franchise in the dealership facilities, the dealer shall also be entitled to compensation for the contribution of the line-make to payment of the rent or to covering obligation for the fair rental value of the dealership facilities for the period set forth in subdivision 5c (2). Fair market value of the franchise for the line-make shall only include the goodwill value of the dealer's franchise for that line-make in the dealer's relevant market area.

(2) If the line-make is the only line-make for which the dealer holds a franchise in the dealership facilities, the manufacturer, distributor, or factory branch shall also pay assistance with respect to the dealership facilities leased or owned by the dealer as follows: (i) the manufacturer, distributor, or factory branch shall pay the dealer a sum equivalent to the rent for the unexpired term of the lease or three years' rent, whichever is the lesser, or (ii) if the dealer owns the dealership facilities, the manufacturer, distributor, or factory branch shall pay the dealer a sum equivalent to the reasonable rental value of the dealership facilities for three years.

To be entitled to facilities assistance from the manufacturer, distributor, or factory branch, the dealer shall have the obligation to mitigate damages by listing the dealership facilities for lease or sublease with a licensed real estate agent within 30 days after the effective date of the termination of the franchise and thereafter by reasonably cooperating with such real estate agent in the performance of the agent's duties and responsibilities. If the dealer is able to lease or sublease the dealership facilities on terms that are consistent with local zoning requirements to preserve the right to sell motor vehicles from the dealership facilities and the terms of the dealer's lease, the dealer shall be obligated to pay the manufacturer the net revenue received from such mitigation, but only following receipt of facilities assistance payments pursuant to clause (i) or (ii) of subdivision 5c (2), and only up to the total amount of facilities assistance payments that the dealer has received.

6. To fail to allow a dealer the right at any time to designate a member of his family as a successor to the dealership in the event of the death or incapacity of the dealer. Such designation may be made by the dealer or, in the event of the death or incapacity of the dealer, by the qualified executor or personal representative of the dealer. It shall be unlawful to prevent or refuse to honor the succession to a dealership by a member of the family of a deceased or incapacitated dealer if the franchisor has not provided to the member of the family designated the dealer's successor written notice of its objections to the succession and of such person's right to seek a hearing on the matter before the Commissioner pursuant to this article, and the Commissioner determines, if requested in writing by such member of the family within 30 days of receipt of such notice from the franchisor, and after a hearing on the matter before the Commissioner pursuant to this article, that the failure to permit or honor the succession is unreasonable under the circumstances. No member of the family may succeed to a franchise unless (i) the franchisor has been given written notice as to the identity, financial ability, and qualifications of the member of the family in question, and (ii) the succession to the franchise will not involve, without the franchisor's consent, a relocation of the business.

7. To delay, refuse, or fail to deliver to any dealer, if ordered by the dealer, in reasonable quantities and within a reasonable time, any new vehicles of each series and model sold or distributed by the franchisor as covered by such franchise and which are publicly advertised by the manufacturer, factory branch, distributor, or distributor branch in the Commonwealth to be available for immediate delivery, provided, however, that the failure to deliver any motor vehicle shall not be considered a violation of this chapter if such failure is due to an act of God, a work stoppage or delay due to a strike or labor difficulty, a shortage of materials, a lack of available manufacturing capacity, a freight embargo, or other cause over which the manufacturer, factory branch, distributor, or distributor branch shall have no control. If ordered by a dealer, a franchisor shall deliver an equitable supply of new vehicles during the model year of each series and model under the dealer's franchise in proportion to the sales objectives or goals established by the franchisor for the dealer compared to the sales objectives or goals established by the other same line-make dealers in the Commonwealth, provided, however, that the failure to deliver any motor vehicle shall not be considered a violation of this chapter if such failure is due to a cause over which the manufacturer, factory branch, distributer, or distributer branch shall have no control. Upon the written request of any dealer holding its sales or sales and service franchise, the manufacturer or distributor shall disclose to the dealer in writing the basis upon which new motor vehicles of the same line-make are allocated, scheduled, and delivered to dealers in the Commonwealth, and the basis upon which the current allocation or distribution is being made or will be made to such dealer. In the event that allocation is at issue in a request for a hearing, the dealer may demand the Commissioner to direct that the manufacturer or distributor provide to the dealer, within 30 days of such demand, all records of sales and all records of distribution of all motor vehicles to the same line-make dealers who compete with the dealer requesting the hearing.

7a. To fail or refuse to offer to its same line-make franchised dealers all models manufactured for the line-make, or require a dealer to pay any extra fee, or remodel, renovate, or recondition the dealer's existing facilities, or purchase unreasonable advertising displays or other materials as a prerequisite to receiving a model or a series of vehicles.

7b. To require or otherwise coerce a dealer to underutilize the dealer's facilities by requiring or otherwise coercing a dealer to exclude or remove from the dealer's facilities operations for selling or servicing of a line-make of vehicles for which the dealer has a franchise agreement to utilize the facilities.

ADD-9

7c. To require a dealer to purchase goods or services from a vendor selected, identified, or designated by a manufacturer, factory branch, distributor, distributor branch, or one of its affiliates by agreement, program, incentive provision, or otherwise without making available to the dealer the option to obtain the goods or services of substantially similar quality from a vendor chosen by the dealer. For purposes of this subdivision, the term "goods" does not include moveable displays, brochures, and promotional materials containing material subject to intellectual property rights of, or special tools and training as required by the manufacturer, or parts to be used in repairs under warranty obligations of, a manufacturer, factory branch, distributor, or distributor branch.

7d. To fail to provide a notice to a dealer when notifying it of the requirement to purchase goods or services from a vendor selected, identified, or designated by a manufacturer, factory branch, distributor, or distributor branch of the dealer's rights pursuant to subdivision 7c.

7e. To fail to provide to a dealer, when the manufacturer, factory branch, distributor, or distributor branch claims that a vendor chosen by the dealer cannot supply goods and services of substantially similar quality, a disclosure concerning the vendor selected, identified, or designated by the franchisor stating (i) whether the manufacturer, factory branch, distributor, distributor branch, or one of its affiliates, or any officer, director, or employee of the same, has an ownership interest, actual or beneficial, in the vendor and, if so, the percentage of the ownership interest and (ii) whether the manufacturer, factory branch, distributor, distributor branch, or one of its affiliates has an agreement or arrangement by which the vendor pays to the manufacturer, factory branch, distributor, distributor branch, or one of its affiliates, or any officer, director, or employee of the same, any compensation and, if so, the basis and amount of the compensation to be paid as a result of any purchases by the dealer, whether it is to be paid by direct payment by the vendor or by credit from the vendor for the benefit of the recipient.

7f. To fail to provide to a dealer, if the goods and services to be supplied to the dealer by a vendor selected, identified, or designated by the manufacturer, factory branch, distributor, or distributor branch are signs or other franchisor image elements to be leased to the dealer, the right to purchase the signs or other franchisor image elements of like kind and quality from a vendor selected by the dealer. If the vendor selected by the manufacturer, factory branch, distributor, or distributor branch is the only available vendor, the dealer must be given the opportunity to purchase the signs or other franchisor image elements at a price substantially similar to the capitalized lease costs thereof. This subdivision shall

not be construed to allow a dealer to impair or eliminate the intellectual property rights of the manufacturer, factory branch, distributor, or distributor branch, nor to permit a dealer to erect or maintain signs that do not conform to the intellectual property usage guidelines of the manufacturer, factory branch, distributor, or distributor branch.

8. To include in any franchise with a motor vehicle dealer terms that are contrary to, prohibited by, or otherwise inconsistent with the requirements of this chapter.

8a. For any franchise agreement, to require a motor vehicle dealer to pay the attorney's fees of the manufacturer or distributor related to hearings and appeals brought under this article.

9. To fail to include in any franchise with a motor vehicle dealer the following language: "If any provision herein contravenes the laws or regulations of any state or other jurisdiction wherein this agreement is to be performed, or denies access to the procedures, forums, or remedies provided for by such laws or regulations, such provision shall be deemed to be modified to conform to such laws or regulations, and all other terms and provisions shall remain in full force," or words to that effect.

10. To enter into any agreement with a motor vehicle dealer in which the manufacturer, factory branch, distributor, distributor branch, or one of its affiliates is given site control over the premises of a dealer that does not terminate upon the occurrence of any of the following events: (i) the right of the franchisor to manufacture or distribute the line-make of vehicles covered by the dealer's franchise is sold, assigned, or otherwise transferred by the manufacturer, factory branch, distributor, or distributor branch to another; (ii) the final termination of the dealer's franchise for any reason; or (iii) the manufacturer, factory branch, distributor, or distributor branch of its affiliate fails for any reason to exercise its right of first refusal to purchase the assets or ownership of the business of the dealer when given the opportunity to do so by virtue of its franchise agreement, another agreement, or as set forth in § 46.2-1569. For purposes of this subdivision, the term "site control" shall mean the contractual right to control in any way the commercial use and development of the premises upon which a dealer's business operations are located, including the right to approve of additional or different uses for the property beyond those of its franchise, the right to lease or sublease the dealer's property, or the right or option to purchase the dealer's property.

ADD-11

## Va. Code Ann. § 46.2-1569.1

§ 46.2-1569.1. Manufacturer or distributor right of first refusal.

Notwithstanding the terms of any franchise agreement, in the event of a proposed sale or transfer of a dealership, the manufacturer or distributor shall be permitted to exercise a right of first refusal to acquire the new vehicle dealer's assets or ownership, if such sale or transfer is conditioned upon the manufacturer's or dealer's entering into a dealer agreement with the proposed new owner or transferee, only if all the following requirements are met:

1. To exercise its right of first refusal, the manufacturer or distributor must notify the dealer in writing within 45 days of its receipt of the completed proposal for the proposed sale or transfer;

2. The exercise of the right of first refusal will result in the dealer's and dealer's owner's receiving the same or greater consideration as they have contracted to receive in connection with the proposed change of ownership or transfer;

3. The proposed sale or transfer of the dealership's assets does not involve the transfer or sale to a member or members of the family of one or more dealer owners, or to a qualified manager or a partnership, limited liability company, corporation, or other entity controlled by such persons; and

4. The manufacturer or distributor agrees to pay the reasonable expenses, including attorney's fees which do not exceed the usual, customary, and reasonable fees charged for similar work done for other clients, incurred by the proposed new owner and transferee prior to the manufacturer's or distributor's exercise of its right of first refusal in negotiating and implementing the contract for the proposed sale or transfer of the dealership or dealership assets. Notwithstanding the foregoing, no payment of such expenses and attorney's fees shall be required if the dealer has not submitted or caused to be submitted an accounting of those expenses within 30 days of the dealer's receipt of the manufacturer's or distributor's written request for such an accounting. Such accounting may be requested by a manufacturer or distributor before exercising its right of first refusal.

## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered users of the CM/ECF system.

/s/ Christopher T. Handman
Christopher T. Handman